**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **Dr. Georgios Alexopoulos,** ) | |
| ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | **Civil Action No.** |
| **SSM Health St. Louis University Hospital, and** ) | |
| ) | |
| **Dr. Philippe Mercier,** ) | |
| ) | |
| **Dr. Jeroen Coppens,** ) | |
| ) | **Jury Trial Demanded** |
| **Defendants.** ) | |

**COMPLAINT**

**COMES NOW** Plaintiff, Dr. Georgios Alexopoulos, by and through undersigned counsel, and hereby files this Complaint against Defendants SSM Health St. Louis University Hospital ("SLU Hospital"), Dr. Philippe Mercier, and Dr. Jeroen Coppens, alleging as follows:

## I. INTRODUCTION

1. This action arises from unlawful employment practices, including harassment, retaliation, discrimination based on national origin, violations of the Family and Medical Leave Act (FMLA), forced labor under the Trafficking Victims Protection Act (TVPA), and denial of procedural due process, resulting in severe harm to Plaintiff's career and well-being.

2. Defendants SLU Hospital, Dr. Philippe Mercier, and Dr. Jeroen Coppens subjected Plaintiff, a neurosurgery resident and Greek national on a J-1 visa, to ongoing harassment

and discriminatory treatment, exploiting his immigration status and protected activities to coerce labor under threats of deportation and irreparable professional harm.

3. Multiple federal investigations and a recent site visit by the Accreditation Council for Graduate Medical Education (ACGME) underscore the systemic retaliation, discrimination, and due process violations at SSM SLU Hospital. As a direct result of these violations, the ACGME issued a formal accreditation warning on April 4, 2025, publicly announcing concerns about the program's compliance with national educational standards. These developments highlight longstanding deficiencies in oversight and institutional accountability, further exposing the program's failure to address critical safety, educational, and workplace issues.

4. Plaintiff seeks redress for these unlawful actions and damages to compensate for emotional distress, reputational harm, career-ending professional consequences, lost past and future earnings, and other injuries caused by Defendants' conduct.

## II. JURISDICTION AND VENUE

5. This Court has jurisdiction under 28 U.S.C. § 1331, as this action involves claims under federal law, including the TVPA (18 U.S.C. § 1589) and the FMLA (29 U.S.C. § 2601 et seq.).

6. Supplemental jurisdiction is appropriate under 28 U.S.C. § 1367 for claims arising under Missouri law, including violations of the Missouri Human Rights Act ("MHRA") and the Missouri Whistleblower Protection Act ("WPA").

7. On December 18, 2024, Plaintiff timely filed a Charge of Discrimination with the Missouri Commission on Human Rights ("MCHR") and Equal Employment Opportunity Commission ("EEOC").

8. Plaintiff received a Notice of Right to Sue from the MCHR and EEOC on May 23, 2025, and has filed this action within ninety (90) days of that notice.

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as the events giving rise to this action occurred within the Eastern District of Missouri.

### III. PARTIES

10. Plaintiff Dr. Georgios Alexopoulos is a Greek national who, at all relevant times, was employed as a neurosurgery resident at SLU Hospital under a J-1 visa.

11. Defendant SSM Health St. Louis University Hospital is a healthcare provider operating in St. Louis, Missouri, and an employer under applicable federal and state laws.

12. Defendant Dr. Philippe Mercier is the Division Director of Neurosurgery at SLU Hospital and was directly involved in discriminatory and retaliatory actions against Plaintiff.

13. Defendant Dr. Jeroen Coppens is the Program Director of the Neurosurgery Residency Program at SLU Hospital and was directly involved in discriminatory and retaliatory actions against Plaintiff.

### IV. FACTUAL ALLEGATIONS

14. Dr. Georgios Alexopoulos, a Greek national, began his tenure at SLU Hospital on July 1, 2018. He was in the final year (seventh) of a seven-year neurosurgery residency when he was involuntarily dismissed on July 8, 2024.

15. In 2018, the U.S. Department of State granted an exceptional extension of the Plaintiff's J-1 visa sponsorship for up to nine years to allow him to complete the neurosurgery residency program at SLU Hospital. This extraordinary extension strictly bound the Plaintiff to the program, leaving him with no viable alternatives for continuing his residency training in the United States.

16. Before joining SLU Hospital, Dr. Alexopoulos completed medical school and an EU-approved neurosurgery residency in Greece in June 2016.

17. For nearly two decades, Plaintiff devoted every ounce of his energy to achieving his dream of becoming a neurosurgeon in the United States—a goal many deemed unattainable for a foreign-trained doctor. He undertook rigorous preparations for the national examinations (USMLE) and pursued extensive clinical training in both Greece and the United States, demonstrating exceptional dedication and capability.

18. To further enhance his qualifications, Plaintiff pursued additional training in the U.S., completing a year of general surgery in Chicago (2016-2017) and a pediatric neurosurgery fellowship in Boston (2017-2018), before joining the neurosurgery residency program at SSM SLU Hospital in 2018.

19. Throughout his career, Dr. Alexopoulos maintained an impeccable academic and professional record, working across multiple institutions in both Europe and the United States. However, his trajectory was abruptly disrupted by the discriminatory actions he faced at SSM SLU Hospital.

20. Because of his extensive prior experience, Plaintiff was routinely assigned responsibilities beyond those customarily imposed on residents, effectively requiring him to perform duties at a level reserved for senior neurosurgery residents.

21. The additional responsibilities heaped upon Plaintiff significantly impacted his treatment during his six years at SLU Hospital, as it became clear that Defendants exploited his visa status as a Greek national.

22. The Defendants, fully aware that the Plaintiff's J-1 visa had been exceptionally extended specifically for his training at SSM SLU Hospital, leveraged this immigration dependency to maintain control over him. As his visa neared the end of its duration, Dr. Coppens exploited the Plaintiff's vulnerability, ensuring that any attempt to raise legitimate concerns would lead to immediate retaliation and eventual deportation, making him an "easy target" for abuse.

23. From 2018 to 2021, Plaintiff had limited interactions with the current Program Director Dr. Jeroen Coppens, as he was not directly supervised by him.

24. Dr. Coppens' challenging demeanor and difficult approach made him well-known among senior neurosurgery residents, who generally avoided him.

25. In 2019, following the departure of Dr. Richard Bucholz, Dr. Coppens assumed the role of neurosurgery program director out of necessity, as he was the only US board-certified neurosurgeon (ABNS) available at SLU Hospital.

26. Upon information and belief, although Dr. Coppens openly expressed dissatisfaction with the added responsibilities of the program director role, including resident training, addressing complaints, and managing administrative tasks—he deliberately shifted an excessive share of these duties onto Plaintiff. Unlike his U.S. citizen colleagues, Plaintiff was uniquely dependent on the program for both immigration status and future career prospects. Dr. Coppens exploited this vulnerability by assigning Plaintiff

disproportionately burdensome clinical and administrative responsibilities that far exceeded those expected of similarly situated residents.

27. Dr. Coppens' appointment was driven by necessity rather than personal interest or professional inclination. While he may have maintained a difficult demeanor with others, his treatment of Plaintiff was distinctively targeted and coercive. He repeatedly referred to the program as a "prison" and to Plaintiff as the "chief prisoner". These comments, combined with the imposition of excessive duties and the leveraging of Plaintiff's immigration status, reflect not merely frustration with his role, but a willful intent to dominate and retaliate against someone he viewed as powerless to resist.

28. Neurosurgery residents serve as force multipliers for attending surgeons by managing significant patient volumes for pre-surgical, surgical, and post-operative care, thereby allowing attendings to focus on complex procedures.

29. Without adequate resident support, the neurosurgery service became unsustainable, jeopardizing both patient safety and the program's ability to fulfill its educational mission.

30. Since 2021, the SSM SLU Neurosurgery Group had already been under both external and internal scrutiny by "The Joint Commission" and hospital administration due to multiple ongoing patient safety events.

31. Defendant Dr. Philippe Mercier, the Division Chief, explicitly highlighted these critical issues in emails dated 5/20/2021 and 12/28/2021, among others, emphasizing the urgent need for stricter protocols. These problems were well-documented long before the Plaintiff assumed his role as chief resident.

6

32. In 2022, the dynamics of the neurosurgery program worsened in an already troubled department that had been under scrutiny for multiple patient safety concerns. The situation deteriorated further when the other senior resident, Dr. Ryan Cleary, decided to transfer programs, leaving the Plaintiff as the sole senior resident. Since 2021, Dr. Cleary sought to transfer to another institution due to the toxic nature of the neurosurgery residency program at SLU. In response, the Defendants retaliated against Dr. Cleary, attempting to obstruct his ability to continue training elsewhere. However, as a U.S. citizen, Dr. Cleary was ultimately able to navigate the process and successfully transferred to Washington University in St. Louis to complete his neurosurgery residency. Despite the program's retaliation, Dr. Cleary formally reported the unethical practices at SLU to the ACGME.

33. Unlike U.S. citizen residents who possess greater mobility in changing programs or asserting their rights without fear of deportation, Plaintiff—being a J-1 visa holder—was uniquely vulnerable. His contract was strictly bound to the program, leaving him with no viable alternatives if terminated.

34. Defendants exploited Plaintiff's vulnerable immigration status to coerce him into accepting excessive work, thereby constituting forced labor. He was the only J-1 visa exchange visitor in the neurosurgery program since 2021. From July 2021 to June 2022, he was repeatedly pulled from his mandatory protected research year to perform clinical duties under threat of termination and deportation. Coerced into premature clinical and leadership responsibilities, Plaintiff's academic development was severely disrupted. Even after sustaining a ruptured Achilles tendon in January 2022 resulting in temporary disability, he was forced to continue working under threats that medical leave would

delay his graduation and trigger visa revocation. From May to December 2022, Plaintiff managed the entire neurosurgery service alone under continued threat of termination. He was compelled to serve as chief resident earlier and for a longer cumulative period than any peer, in violation of ACGME and American Board of Neurological Surgery (ABNS) regulations. He was repeatedly denied his ACGME- and ABNS-mandated elective year and was again assigned as chief resident in 2024, assuming responsibilities designated for the incoming chief resident, Dr. Jorge Urquiaga—despite already having served in that role longer than any peer, in violation of training requirements and equitable assignment norms. Throughout this time, he was burdened with excessive 24-hour senior call duties (15+ per month). Even as junior residents advanced and new residents were added, Plaintiff's call duties remained unnecessarily prolonged and disproportionately heavy, reflecting the targeted and discriminatory nature of his workload. Plaintiff was forced to work during scheduled time off, including during a March 16, 2023, incident reported to internal channels and the EEOC, after which he was threatened with loss of surgical training and relegated to an assistant role in the OR, undermining his operative experience and mandatory training.

35. Furthermore, the Plaintiff was one of the few neurosurgery residents in the country—and the only resident in the program—to receive an exceptional J1 visa extension from the U.S. Department of State due to his extensive qualifications and clinical track record. However, this rare privilege further entrenched his dependency on the program, leaving him uniquely vulnerable to coercion, retaliation, and exploitative labor practices. The extension made it virtually impossible for Plaintiff to transfer or withdraw without

jeopardizing his legal status and career, a fact repeatedly used against him by program leadership.

36. Following Dr. Ryan Cleary's departure in 2022, as program director, Dr. Coppens began expressing frustration with the burdens of managing the program and disproportionately directed this frustration at Plaintiff, rather than utilizing appropriate institutional channels. Under threats of termination, Plaintiff was compelled to assume responsibilities far beyond the scope of a resident, including administrative duties such as scheduling meetings and coordinating multidisciplinary conferences, tasks typically assigned to paid program coordinators. In response to widespread patient safety concerns, Dr. Mercier assigned Plaintiff the responsibility of improving divisional documentation to meet quality metrics, directing him to develop and implement standardized templates, as the division's new "standard of care." Additionally, Dr. Coppens repeatedly instructed Plaintiff to sign clinical notes and complete electronic documentation on his behalf while absent from the hospital, in violation of HIPAA regulations. On multiple occasions, Dr. Coppens sarcastically threatened Plaintiff: *"I will keep you here doing administrative work for two years or more until you graduate if I cannot find any other senior residents."* These cumulative burdens were uniquely imposed on Plaintiff, who—unlike his U.S. citizen peers—lacked the freedom to refuse or report such mistreatment without risking deportation or irreparable professional harm.

37. With no other senior neurosurgery resident to assist, the administration placed the full burden of neurosurgery services on the Plaintiff, effectively leaving him to manage the program alone as the incoming chief resident.

38. Before the Plaintiff assumed his role as chief resident, Defendant Dr. Philippe Mercier sought assistance from Associate Chief Medical Officer Dr. Zafar Akram Jamkhana in an email dated 4/15/2022 to improve practices in response to significant morbidity and mortality rates within the neurosurgery department.

39. Defendant Dr. Mercier acknowledged ongoing patient safety incidents and high perioperative morbidity and mortality, stating that the Plaintiff would play a key role in ensuring these improvements became the standard of care.

40. Despite these efforts, Defendants later shifted blame for the ongoing issues onto the Plaintiff, using him as a scapegoat for Defendants' leadership failures, further undermining his role as chief resident and worsening the already dysfunctional environment within the division.

41. This issue was further exacerbated by Dr. Mercier's efforts to aggressively expand the patient volume across multiple institutions and hospitals in pursuit of profit, placing additional strain on an already understaffed and overburdened program.

42. Defendant Dr. Mercier repeatedly emphasized his "business model" of increasing workload without adding new staff, arguing that this approach would make the program more profitable and create future job opportunities.

43. SLU Hospital's administration appeared to assume that Plaintiff, as an immigrant, would conform to the stereotype of a "grateful immigrant" – compliant and uncritical of the program's unethical practices.

44. Plaintiff witnessed and reported multiple critical patient safety incidents resulting from Defendants' chronic understaffing, inadequate supervision, and leadership negligence,

resulting in serious harm, increased morbidity and mortality, and systemic patient safety failures.

45. Despite the program's emphasis on expanding case volume and hospital partnerships, staffing levels remained critically insufficient. Recognizing the dangers this posed, the Plaintiff felt ethically and professionally obligated—guided by the principles of the Hippocratic Oath—to raise concerns about the unsafe conditions.

46. Key incidents included wrong-site procedures, such as misplaced brain catheters due to inadequate supervision, as well as delays in urgent neurosurgical interventions, particularly on weekends when a single resident covered both adult and pediatric hospitals.

47. Patients experienced frequent postoperative infections and complications due to insufficient follow-up, leading to prolonged hospital stays, additional surgeries, and severe harm. Intraoperative errors and missed critical steps further resulted in permanent patient damage, while inadequate resident coverage in critical care units, the ER, and hospital wards created dangerous gaps in care.

48. Plaintiff raised concerns with Dr. Coppens and Dr. Mercier regarding these conditions and their impact on the safety and well-being of both patients and staff.

49. During a Christmas meeting in December 2022 at the residence of Defendant Dr. Jeroen Coppens, he openly acknowledged the unsustainable conditions within the neurosurgery residency program.

50. Dr. Coppens admitted to the Plaintiff that chronic understaffing and an increasing patient workload made it impossible for the few available residents to provide quality care, as they were expected to manage 40 to 50 patients daily across three hospitals.

51. Defendant Dr. Coppens explicitly recognized the strain this placed on both residents and patient safety.

52. Defendant Dr. Coppens falsely assured Plaintiff that he would raise these concerns with Division Chief Dr. Philippe Mercier and advocate for better working conditions. However, he privately admitted that his efforts would likely be ignored, as Dr. Mercier was focused on expanding neurosurgical services despite insufficient personnel, creating an unmanageable situation. Dr. Coppens ultimately conceded that there was nothing he could do to change it.

53. Plaintiff raised concerns with the remaining neurosurgery attendings, residents, and the University.

54. When Plaintiff raised these legitimate concerns about workplace and patient safety, Defendants responded not by remedying these issues but by employing coercive tactics. Plaintiff was repeatedly threatened with termination—a threat that would jeopardize his immigration status and result in deportation—designed to silence his complaints and exploit his vulnerable position.

55. Plaintiff faced multiple punitive measures—including extra duties and extended hours—solely for making legitimate complaints about patient safety and working conditions. He was labeled the "ringleader" of the residents, a designation used to justify retaliation and isolate him from his peers.

56. Over the years, as workloads increased without additional staffing, Defendants escalated their hostile conduct. When Plaintiff voiced concerns, Dr. Coppens responded with more threats and punitive measures.

57. Despite the repeated threats of termination and deportation, Plaintiff courageously reported operational concerns about SLU Hospital both internally and externally.

58. During the 2022-2023 academic year, in retaliation for his protected disclosures, Plaintiff was forced to serve as chief resident for at least 14 consecutive months without adequate support—a duty that exceeded regulatory limits and further endangered patient safety. No other resident in the program, or even in the country, has served more than the mandatory 12 months as chief resident.

59. To achieve this, Plaintiff's academic curriculum, structured according to national ABNS guidelines, was arbitrarily restructured, disrupting his protected research year for several months. Dr. Jeroen Coppens coerced Plaintiff into taking on additional clinical duties beyond those of his peers. This deliberate disruption not only violated established academic training structures but also contributed to Plaintiff's excessive workload and further retaliation.

60. Such arbitrary restructuring is never imposed on U.S. citizen residents or other trainees in ACGME-accredited programs, as the academic curriculum must adhere to established national guidelines and cannot be altered at will.

61. During the same period, Plaintiff was required to cover a minimum of 15 senior calls per month; Plaintiff was repeatedly threatened to avoid logging his actual work hours accurately, concealing the fact that residents were regularly exceeding the maximum of 80 hours per week averaged over a four-week period—a clear violation of ACGME regulations.

62. Plaintiff was effectively left to run the neurosurgery program alone for over six months during his chief residency until the end of 2022, when a newly hired senior resident, Dr.

Muhammad Kandel, was incorporated into the call schedule. This unprecedented situation may be the first time such an occurrence has happened in a U.S.-accredited neurosurgery program, highlighting severe deficiencies in Defendants' leadership and oversight.

63. Plaintiff  was forced to complete his chief residency year during his fifth year in the program (PGY-5), rather than in PGY-6 or PGY-7, as mandated by national board requirements (ABNS) for neurosurgery residents across the country.

64. Plaintiff was coerced into working despite suffering from a severe disability—a tendon rupture requiring surgery—under direct threats from the Defendants, who warned that noncompliance would result in delayed graduation and deportation.

65. Unlike neurosurgery residents across the country and his peers, Plaintiff was repeatedly denied his protected elective year in the program, a privilege consistently granted to all other residents in accordance with national guidelines (ABNS).

66. Plaintiff was the only full-term resident in the program denied an elective year of training, despite making multiple formal inquiries to the leadership. This denial not only deviated from program norms and ABNS standards but was later compounded by placing him on probation during his final year of training.

67. Retaliation against Plaintiff extended to actions taken in response to his external protected activities.

68. On March 19, 2023, Plaintiff filed an inquiry with the Equal Employment Opportunity Commission (EEOC), Case #560-2023-01514, following a humiliating incident related to his protected status as a foreign national.

14

69. In response, SLU Hospital's neurosurgery administrators, including Drs. Coppens and Mercier, escalated their retaliatory tactics by threatening to remove Plaintiff from the program if he continued to raise concerns or report issues internally or externally, thereby jeopardizing his future in medicine.

70. As part of this effort, Defendants began using vague and unsubstantiated allegations of unprofessionalism to justify their actions, creating a false narrative to discredit Plaintiff and undermine his credibility.

71. In an email dated 3/21/2023, Defendant Dr Coppens maliciously attempted to accuse the Plaintiff of unprofessional behavior, falsely alleging that he had failed to round on patients. However, after the Plaintiff provided supporting evidence, the program director was forced to retract his claim and issue a written apology, admitting, *"You did round on 303 and I was mistaken."*

72. This incident exemplifies how the Defendants were actively trying to fabricate allegations against the Plaintiff to build a case against him.

73. Plaintiff was repeatedly threatened with termination and subsequent deportation, not only in closed-door meetings but also in routine discussions with the defendants. In one egregious instance, Dr. Mercier explicitly threatened Plaintiff with deportation, comparing his situation to that of another immigrant doctor who had been placed on probation—further using Plaintiff's immigration status as a tool of coercion.

74. Despite these repeated threats, the Defendants were fully aware that they could not terminate the Plaintiff at that point in his residency, as they needed him to complete his chief residency year. Firing him would have resulted in the program's collapse, further exposing its structural deficiencies and reliance on the Plaintiff to sustain neurosurgical

services. As such, they planned to fulfill their retaliatory threats after exploiting the Plaintiff's labor, intending to discard him before he could complete his residency—an act of deliberate revenge for speaking out against the program's failures.

75. To further conceal their misconduct, the Defendants shifted blame onto the Plaintiff, using him as a scapegoat for the program's systemic deficiencies and failures in leadership.

76. Defendants' retaliatory conduct was compounded by repeated disparaging remarks targeting Plaintiff's Greek national origin, intended to coerce him into accepting excessive work and to silence his protected disclosures.

77. Defendants' comments included "We don't know how you do it back in Greece but here we do it this way."

78. Defendants often commented on Plaintiff's accent. On one instance, Dr. Richard Bucholz, called Plaintiff into his office during a semi-annual evaluation. He insisted that Plaintiff should improve his pronunciation, explicitly stating to him "you do not sound like an American." He went further, advising Plaintiff to take classes to modify how he speaks (accent), reinforcing a discriminatory bias against Plaintiff's linguistic background.

79. Dr. Jeroen Coppens frequently made derogatory and dismissive comments about Plaintiff's Greek heritage. He repeatedly implied that Plaintiff's cultural background might make him "warm-blooded" adding that such behavior was "not allowed in the USA." On one occasion, Dr Coppens directly told Plaintiff that if he wished to complain about or challenge issues, "You should better return back to your home country."

80. On another occasion, Dr Coppens made a targeted remark about both Plaintiff, as a Greek, and his senior colleague Dr. Muhammad Kandel, who is Egyptian. He stated that

"Greeks and Egyptians might be used to fights historically, and you consider this normal, but here we are in the USA," perpetuating cultural stereotypes.

81. In discussions, Dr. Coppens explicitly likened the neurosurgery residency to a "prison," telling the Plaintiff upon assuming the role of chief resident, "You are now the chief prisoner. Never assume you are anything more than that."

82. Dr. Coppens repeatedly threatened the Plaintiff, stating that if the program failed to recruit more senior residents, he would be forced to serve as chief resident for two or more consecutive years. These remarks were made in a demeaning and sarcastic manner, including statements such as, *"I will keep you here to run the main service for two years, or even more, until you graduate, since you are bound to our program."* Unlike U.S. citizen residents who had the flexibility to transfer programs, the Plaintiff's immigration status made him strictly bound to SSM SLU Hospital, leaving him particularly vulnerable to threats of prolonged service and exploitation.

83. Plaintiff's extensive internal and external reporting to safeguard his rights only resulted in further retaliation by Defendants.

84. In January 2024, Plaintiff's father passed away in Greece—a personal tragedy that Defendants exploited by intensifying the workload imposed on Plaintiff, knowing that his ability to manage family affairs or travel to Greece would be severely hindered.

85. In February 2024, Dr. Coppens forbade Plaintiff from attending any further fellowship or job interviews, stating, 'You have interviewed enough.' This arbitrary restriction further jeopardized Plaintiff's future career prospects and was publicly announced during the monthly residents' meeting, reinforcing the program's pattern of retaliation and obstruction of career advancement.

86. Despite these overwhelming personal challenges, Plaintiff continued to speak out about critical patient safety risks. Plaintiff contacted the Accreditation Council for Graduate Medical Education (ACGME) and participated in its mandatory 2024 annual resident survey, which was intended to be anonymous and free from reprisals.

87. The cumulative ACGME's annual resident survey is a mandatory component of accreditation enforcement, ensuring that US residency programs meet the required educational and workplace standards. Compliance with these standards is essential for programs to maintain federal funding.

88. Plaintiff's honest and anonymous evaluation of the program triggered the final retaliatory actions by the Defendants, ultimately leading to his dismissal.

89. In late April 2024, the neurosurgery residency program at SSM SLU Hospital was reported in the lowest national percentiles across multiple areas, requiring the development of a corrective action plan for each identified deficiency. These deficiencies highlighted critical workplace safety concerns, including faculty unprofessionalism, retaliation against residents, ongoing abuse and harassment, lack of teaching and supervision, resident sleep deprivation, and repeated duty hour violations.

90. The program's poor evaluation in the ACGME survey directly threatened its financial stability and existence, incentivizing Defendants to scapegoat Plaintiff for exposing these failures.

91. In May 2024, following the annual ACGME survey results, Defendant Dr. Philippe Mercier, the Division Director, accused the Plaintiff of "trying to shut the program down" after the program received a poor overall evaluation. During this meeting, Dr. Mercier again threatened Plaintiff with deportation and referenced the punitive measures taken

18

against another immigrant doctor, Dr Muhammad Kandel, thereby reinforcing the coercive use of Plaintiff's immigration status.

92. In response to complaints from Plaintiff and other residents, ACGME eventually launched an investigation into the neurosurgery residency program leading to an unplanned site visit on January 24, 2025.

93. ACGME site visit subsequently led to a formal accreditation warning issued in April 2025, substantiating Plaintiff's serious allegations regarding violations of accreditation standards.

94. The ACGME publicly confirmed both the unplanned site visit and the formal accreditation warning through its official website.

95. The Defendants openly accused the Plaintiff of "putting the program in jeopardy" for honestly presenting the structural deficiencies of the SSM SLU neurosurgery program externally to the ACGME.

96. On June 5, 2024, Dr. Alexopoulos received devastating news that his mother, who lives alone in Greece, had been found bedridden and required 24-hour care, following the recent death of his father. The urgency of her condition weighed heavily on him, adding to an already overwhelming situation.

97. As an immigrant unfamiliar with the Family and Medical Leave Act (FMLA) process, Dr. Alexopoulos did not know that he could independently request leave without needing approval from his program director. Having never taken FMLA leave before, he mistakenly believed that addressing this family emergency required the program's support—support he felt certain would not be granted.

98. On June 6, 2024, Plaintiff was summoned to a meeting under the pretext of discussing his year-end evaluation. Instead, the meeting turned into an ambush led by Dr. Coppens and Ms. Lisa Israel, during which false accusations of professional misconduct—including allegations of sexual harassment—were levied against him.

99. At the conclusion of the meeting, Dr. Coppens announced that Plaintiff was being placed abruptly on academic probation—a measure tantamount to a death sentence for a resident—without providing any written notice of deficiencies or an opportunity for remediation.

100. During this meeting, Plaintiff was once again asked to serve as chief resident during his final year of training—a role requiring leadership and oversight—despite being placed on probation, seemingly as a punitive measure. At this point, Plaintiff had already served as chief resident for a longer period than any other neurosurgery resident in the country, making this demand even more egregious.

101. This might be the first time in program history that a resident on probation was asked to serve in such a leading role, further underscoring the arbitrary and retaliatory nature of the program's actions.

102. Academic probation was imposed with the clear intent of precipitating Plaintiff's expulsion from the residency program and irreparably damaging his career prospects in neurosurgery.

103. Defendants' imposition of probation was executed without adherence to due process. Prior to imposing academic probation, ACGME guidelines and SLU Hospital's internal policies mandate formal counseling, written notice, and an opportunity for remediation.

104. Defendants knowingly violated ACGME accreditation standards and their own internal policies by imposing academic probation without adhering to fundamental due process requirements.

105. Plaintiff was not provided with a written notice outlining the deficiencies that led to the probation decision, thereby depriving him of a critical procedural safeguard to mount a defense.

106. The "sham" probation served as a pretext to deny Plaintiff's elective year in the program and forced him to continue under harsher conditions by coercing him to serve once again as the chief resident, limiting his autonomy and reinforcing a culture of control and retaliation.

107. Plaintiff refused to sign the probation paperwork and explicitly informed both his program director and the administration that their actions were retaliatory. In response, Defendants further escalated their coercion, threatening Plaintiff that he could not leave the meeting unless he signed the probation documents.

108. SLU Hospital's failure to follow both its internal and external guidelines for resident discipline, coupled with years of harassment and retaliation, left Plaintiff under severe duress, stress, and exhaustion.

109. On the evening of June 6, 2024, immediately following the probation meeting, with no legal counsel to guide him and overwhelmed by chronic harassment, repeated retaliatory actions, the 'sham' probation, and mounting personal crises, Plaintiff felt he had no other option. Under extreme duress, he was forced to submit his involuntary resignation via email. Plaintiff once again informed SSM SLU Hospital that the Defendants had engaged in ongoing retaliatory behavior.

110.   On the morning of June 7, 2024, after consulting with legal counsel, Plaintiff learned for the first time that FMLA leave does not require managerial approval and that he could address his family emergency directly through HR. With this new understanding, he promptly rescinded his resignation via email and submitted an FMLA request to care for his ailing mother in Greece.

111.   Defendants knowingly accepted Plaintiff's FMLA leave and continued to acknowledge his status as a resident for over 20 days, making the later claim that he 'voluntarily resigned' legally baseless and pretextual. This decision was acknowledged by multiple high-ranking officials in the program and University, including the neurosurgery program director, Dr. Jeroen Coppens—who later signed his FMLA approval paperwork—the graduate medical education (GME) director, Dr. Julie Gammack, the SLU ombudsperson, Ms. Emily Boyd, and multiple other hospital staff.

112.   On June 28, 2024, while nearly a month into Plaintiff's approved FMLA, and shortly after Dr. Alexopoulos formally submitted his appeal of academic probation to the program, the hospital abruptly reversed its position. HR retroactively accepted Plaintiff's resignation, falsely claiming that he had voluntarily stepped down while disregarding his formal rescission.

113.   Defendants' retroactive claim that Plaintiff voluntarily resigned was a pretextual maneuver to facilitate his removal under false pretenses, further demonstrating their bad-faith intent.

114.   On July 8, 2024, while in Greece caring for his ailing mother, the Plaintiff was involuntarily dismissed from the program despite being on approved, written FMLA

leave, formally authorized by HR through Sedgwick. He was blindsided by the news, learning of his termination via email.

115. This termination, executed during a protected leave period, further exemplifies the Defendants' blatant disregard for legal protections and due process.

116. The ACGME's Institutional Requirements and Common Program Requirements emphasize the importance of due process for residents. Programs are obligated to provide residents with the opportunity to appeal adverse actions through a transparent and unbiased process. By failing to offer a formal and fair appeal process, the institution violated ACGME guidelines, breached its internal policies, and denied Dr. Alexopoulos a critical opportunity to defend himself and seek recourse.

117. As the ACGME-accredited sponsoring institution, SSM SLU Hospital bears non-delegable responsibility for maintaining compliant and safe graduate medical education programs. By contracting to host the neurosurgery residency program, SLU Hospital assumed direct oversight obligations under ACGME standards. Despite repeated warnings and resident complaints, the hospital knowingly failed to intervene in the face of systemic retaliation, duty hour violations, unsafe conditions, and the coercive use of visa-dependent labor. This institutional inaction not only facilitated but actively enabled a pattern of structural abuse, creating a dual system where international medical graduates—like Plaintiff—were subjected to exploitative working conditions under threat of academic punishment, delayed graduation, or deportation. Such conduct amounts to negligent retention, constructive fraud, and willful complicity in forced labor practices.

118. Despite Plaintiff's timely rescission —further proven by the program's written FMLA approval as well as multiple emails and phone calls with University officials—

23

SSM HR falsely maintained that Plaintiff had resigned and subsequently refused to issue a formal certification of his residency—a document critical for his future employment in neurosurgery.

119. This deliberate refusal not only obstructs Plaintiff's ability to secure positions in the U.S. but also maliciously interferes with his career on a global scale. By withholding his certification, Defendants have effectively placed insurmountable barriers to his professional advancement, ensuring lasting damage to his career and irreparable harm.

120. Plaintiff had a signed contract for a 2025 neurosurgery fellowship at the University of Wisconsin at Madison, set to begin in July 2025. Defendants maliciously interfered with this position, causing the contract to be voided due to their retaliatory actions.

121. Defendants actively interfered with Plaintiff's post-residency employment prospects by providing false and misleading references to his fellowship director, Dr. Mustafa Baskaya, further obstructing his ability to secure training opportunities.

122. Plaintiff had multiple job offers for attending neurosurgeon positions, which Defendants deliberately sabotaged by refusing to sign the required certification documents.

123. Despite meeting all the requirements for board eligibility (ABNS) at the time of his termination—given his extensive training and background—Defendants, particularly the program director, Dr Jeroen Coppens, maliciously refused to submit his application to the board. This refusal, based on unsubstantiated allegations of unprofessionalism, further exemplifies the program's retaliatory malfeasance and deliberate efforts to destroy Plaintiff's career.

124.     Plaintiff is not only unable to secure employment in the U.S. but is also prevented from working abroad, as hospitals universally require certification verifying his training and work experience over the past six years.

125.     Even after his termination, SLU Hospital continued its retaliation against Plaintiff by denying him another appeal, falsely claiming that he had voluntarily resigned. This violated again both institutional policies and ACGME requirements, underscoring the hospital's ongoing pattern of misconduct.

126.     Plaintiff's termination occurred while he was on approved FMLA leave caring for his ailing mother in Greece. This forced, abrupt departure from the United States not only eradicated his hard-earned career but also left him without immediate support, effectively rendering him homeless during a period of profound personal crisis. Had Dr. Alexopoulos been aware that FMLA did not require program director approval, he would never have submitted the resignation email in the first place.

127.     "Following Plaintiff's complaints, multiple federal agencies—including the EEOC, NLRB, Missouri State Medical Board and the Department of State—have initiated investigations into SLU's employment practices. Additionally, an unplanned ACGME site visit was completed on January 24, 2025, which resulted in a formal accreditation warning—further corroborating concerns about systemic issues at SLU Hospital.

128.     The ACGME's accreditation warning and federal investigations serve as direct validation of Plaintiff's complaints, underscoring the legitimacy of his concerns and exposing Defendants' ongoing violations of accreditation standards.

129.     Defendants have demonstrated a consistent pattern of retaliatory behavior, targeting not only Plaintiff but also multiple residents who have raised concerns. This culture of abuse is further evidenced by the forced departure of Dr. Ryan Cleary and the targeting of Dr. Muhammad Kandel, all of whom suffered retaliation after challenging the program's practices.

130.     These cases reflect a broader pattern in which residents who raise concerns or seek better conditions are met with punitive measures, reinforcing an environment of fear, coercion, and institutionalized retaliation.

131.     Defendants employed unethical and malicious tactics not only against residents but also against attending neurosurgeons. Their retaliatory strategies extended to the former Chair of the Neurosurgery Department at SLU, Dr. Saleem Abdulrauf, whom they systematically targeted until they ultimately forced his dismissal. This removal paved the way for Dr. Philippe Mercier to assume control of the department, further consolidating his authority and reinforcing the culture of retaliation and coercion.

132.     Defendant Dr. Mercier's removal of Dr. Abdulrauf was not an isolated power struggle but a strategic maneuver to consolidate control over the department. By eliminating leadership figures who opposed his exploitative practices, he ensured that residents remained subject to unchecked retaliation and coercion, further entrenching the abusive culture within the program.

133.     As a direct result of Defendants' unlawful actions, Plaintiff suffered substantial economic, emotional, and physical harms and losses. In addition, Plaintiff has incurred significant legal expenses overall, further compounding his economic losses.

134.     Plaintiff was forced to file for bankruptcy during a period of significant emotional distress, as a direct result of his termination.

135.     As a direct result of the Defendants' unlawful actions, the Plaintiff was deported from the United States in August 2024 and was unable to secure another visa sponsorship. His J-1 visa had been exceptionally extended for the neurosurgery program at SLU, and his residency contract was strictly tied to the visa, leaving him with no viable options to continue his training in the country.

136.     The cumulative effect of Defendants' actions has left Plaintiff with irreparable harm to his professional reputation and future career prospects, as well as severe emotional and psychological distress.

137.     Following his termination, the Plaintiff sought behavioral health support at Hopewell Center in St. Louis, where he was diagnosed with major depression as a direct result of the Defendants' unlawful actions. Due to the severe emotional distress caused by these actions, Hopewell Center placed him on suicide prevention monitoring. However, the Plaintiff was unable to continue receiving necessary treatment, as he was forcibly deported from the country, further exacerbating the harm inflicted upon him.

138.     Plaintiff's personal statement further documents that he has experienced severe emotional distress—including frequent panic attacks, debilitating depression, and reliance on crisis intervention services (such as repeated calls to the 988 Suicide Lifeline)—as a direct result of Defendants' retaliatory conduct.

## V. CLAIMS FOR RELIEF

*COUNT I - Forced Labor in Violation of the TVPA, 18 U.S.C. § 1589*

139.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

140.    Defendants knowingly coerced Plaintiff into excessive labor beyond ACGME and ABNS regulations by exploiting his vulnerable immigration status. They leveraged threats of termination, and the withdrawal of his J-1 visa sponsorship to force him into performing work far beyond his contractual responsibilities—actions that uniquely targeted him, unlike his U.S. citizen counterparts.

141.    SSM Health SLU Hospital, as the sponsoring institution and employer, knowingly permitted and profited from a coercive labor structure that disproportionately exploited visa-dependent residents. By refusing to address repeated complaints and continuing to support abusive supervisory practices, the hospital became a co-conspirator in the systemic use of threats, visa leverage, and educational manipulation to compel labor— conduct that meets the statutory definitions under the Trafficking Victims Protection Act and violates core fiduciary and labor protections.

142.    Unlike U.S. citizen residents, Plaintiff was explicitly threatened with immediate deportation if he failed to comply with excessive work demands. This coercive tactic ensured that Plaintiff was unable to refuse unlawful directives.

143.    The explicit threats of deportation and the imposition of excessive work obligations constitute forced labor in violation of Trafficking Victims Protection Act, 18 U.S.C. § 1589(a)(3) and (a)(4).

144.    As a direct result, Plaintiff has suffered significant financial, emotional, and reputational harm.

### *COUNT II - Discrimination in Violation of 42 U.S.C. § 1981*

145.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

146.     Plaintiff is a member of a protected class by virtue of his race and ethnicity and the color of his skin.

147.     Defendants discriminated against Plaintiff by imposing additional work burdens, subjecting him to derogatory comments, and threatening deportation—actions uniquely directed at him because of his race and ethnicity and the color of his skin.

148.     Repeated disparaging remarks regarding Plaintiff's race and ethnicity and the color of his skin, contributed to a hostile work environment that not only undermined his professional standing but also violated the equal employment protections.

149.     Such discriminatory conduct interfered with Plaintiff's right to equal employment opportunities and fair treatment under 42 U.S.C. § 1981, causing him substantial harm.

### COUNT III – Violation of the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq.

150.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

151.     Defendants failed to accurately inform Plaintiff of his FMLA rights and misrepresented his employment status by falsely asserting that he had voluntarily resigned—even after he had timely rescinded his resignation and his FMLA request had been granted by the program and HR.

152.     While on approved FMLA leave in Greece, Plaintiff was ultimately terminated in direct violation of his protected rights.

153.    This misrepresentation deprived Plaintiff of the opportunity to address a critical family emergency and exacerbated his personal and professional hardships, thereby violating the FMLA.

### COUNT IV – Discrimination, Retaliation, and Harassment in Violation of the MHRA

154.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

155.    Defendants' actions created a hostile work environment through the imposition of unwarranted academic probation, excessive work demands, and false representations of Plaintiff's employment status.

156.    The aforementioned hostile work environment was uniquely targeted towards Plaintiff on the basis of his Greek ethnicity and ancestry, as well as his national origin, in violation of the MHRA.

157.    Defendants' imposition of academic probation and subsequent termination were executed without the mandated procedural safeguards, in direct violation of ACGME regulations and SLU's internal policies, thereby constituting retaliatory conduct that deprived Plaintiff of his right to due process.

### COUNT V – Violation of the Missouri Whistleblower Protection Act

158.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

159.    Plaintiff, acting as a whistleblower, reported serious misconduct—including chronic understaffing, unsafe patient conditions, and discriminatory practices—both internally and to external authorities.

160.    Instead of remedying these issues, Defendants escalated punitive measures against Plaintiff, culminating in his wrongful termination and the refusal to certify his residency training, in violation of the WPA.

161.    As a result, Plaintiff has suffered irreparable harm and continues to experience significant financial and emotional losses.

### COUNT VI- Violation of the Title VII of the Civil Rights Act of 1964

162.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

163.    Defendants' actions created a hostile work environment through the imposition of unwarranted academic probation, excessive work demands, and false representations of Plaintiff's employment status.

164.    The aforementioned hostile work environment was uniquely targeted towards Plaintiff on the basis of his Greek ethnicity and ancestry, as well as his national origin and race in violation of the Title VII.

165.    Defendants' imposition of academic probation and subsequent termination were executed without the mandated procedural safeguards, in direct violation of ACGME regulations and SLU's internal policies, thereby constituting retaliatory conduct that deprived Plaintiff of his right to due process.

### VII. DEMAND FOR JURY TRIAL

166.    Plaintiff hereby demands a trial by jury on all issues so triable.

### VIII. PRAYER FOR RELIEF

31

**WHEREFORE,** Plaintiff respectfully requests that this Court enter judgment in his favor and grant relief as follows:

A. **Compensatory Damages:** An award sufficient to compensate Plaintiff for lost wages, lost future earnings (including the forfeited fellowship and high-earning job potential), irreparable, career-ending retaliation, damage to his career prospects and professional reputation, out-of-pocket expenses, and emotional distress.

B. **Punitive Damages:** An award sufficient to deter Defendants and others from engaging in similar unlawful conduct in the future.

C. **Injunctive Relief:** An order requiring Defendants to adopt and implement corrective policies and procedures—including the immediate issuance of a formal certification of Plaintiff's residency—and to take steps to prevent future violations.

An order requiring Defendants to submit and support Plaintiff's application to the American Board of Neurological Surgery (ABNS) for board eligibility, and to affirm that Plaintiff successfully completed six years of accredited neurosurgery training in good standing. This request reflects the fact that Plaintiff had met all ABNS eligibility requirements at the time of his termination, and his ineligibility now constitutes irreparable professional harm.

To prevent further harm to future residents, Plaintiff requests that Defendants be required to implement a corrective action plan subject to federal and ACGME oversight.

32

D. **Attorneys' Fees and Costs:** An award of reasonable attorneys' fees and costs incurred in bringing this action, pursuant to applicable statutes.

E. **Other Relief:** Any further relief that the Court deems just and proper.

Respectfully submitted,

 s/*Alan G. Crone*

Alan G. Crone, (Mo Bar No. 73285)
Alexander Gass (Mo Bar No. 72810)
THE CRONE LAW FIRM, PLC
 88 Union Avenue, 13th Floor
 Memphis, TN 38103
 901.737.7740 (voice)
 901.474.7926 (fax)
 acrone@cronelawfirmplc.com
 agass@cronelawfirmplc.com

*Attorneys for Plaintiff*